# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN (WATERLOO) DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JASON TROY HARRIMAN,<br><br>    Defendant. | No. 18-cr-2033-CJW-MAR<br><br>**ORDER** |

On January 29, 2019, a jury found defendant guilty of two counts of murder for hire, in violation of Title 18, United States Code, Section 1958, rejecting defendant's claim that a federal agent entrapped his into hiring the agent to kill defendant's ex-wife, D.H., and her new boyfriend, A.W. The Court denied defendant's motions for judgment of acquittal made at the close of the government's case and renewed at the close of all of the evidence. Before the Court now is defendant's Motion for Judgment of Acquittal and New Trial. (Doc. 95). Defendant argues that the government failed to prove the essential elements of murder for hire beyond a reasonable doubt and failed to disprove the affirmative defense of entrapment beyond a reasonable doubt. The governments resists defendant's motion. (Doc. 98). For the reasons that follow, the Court denies defendant's Motion for Judgment of Acquittal and New Trial.

## I.    MOTION FOR JUDGMENT OF ACQUITTAL

### A.    The Legal Standard

Federal Rule of Criminal Procedure 29 governs defendant's Motion for Judgment of Acquittal. Rule 29(a) provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

FED. R. CRIM. P. 29(a). When a defendant moves for judgment of acquittal after the prosecution rests,

> [t]he court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

FED. R. CRIM. P. 29(b). If the jury returns a guilty verdict, the defendant may renew a motion for a judgment of acquittal "within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." FED. R. CRIM. P. 29(c)(1). "If the court reserve[d] decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." FED. R. CRIM. P. 29(b). Here, defendant has renewed his motion for judgment of acquittal. Thus, the Court may consider the entire trial record in deciding whether to grant defendant's motion.

A judgment of acquittal is only appropriate if "the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). "The standard for determining the sufficiency of the evidence is strict, and a guilty verdict should not be lightly overturned." *United States v. Jiminez-Perez*, 238 F.3d 970, 972-73 (8th Cir. 2001) (citing *United States v. Ryan*, 227 F.3d 1058, 1063 (8th Cir. 2000)); *see also United States v. Peneaux*, 432 F.3d 882, 890 (8th Cir. 2005); *United States v. Stroh*, 176 F.3d 439, 440 (8th Cir. 1999). "Sufficient evidence exists to support a verdict if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jiminez-Perez*, 238 F.3d at 972 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Thus, the Court may grant a judgment of acquittal "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Tate*, 633 F.3d 624, 628 (8th Cir. 2011) (quoting *United States v. Morales*, 445 F.3d 1081, 1084 (8th Cir. 2006)). In

ruling on a motion for a judgment of acquittal, a court must "view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." *Id.* (quoting *United States v. Milk*, 447 F.3d 593, 598 (8th Cir. 2006)).

Here, the Court instructed the jury that for it to find defendant guilty of murder for hire, the government had to prove three essential elements beyond a reasonable doubt:

> *One*, from about February 2018, through on or about May 30, 2018, the defendant used or caused another person to use a facility of interstate commerce;
>
> *Two*, the defendant did so with the intent that a murder be committed, namely the murder of D.H. and A.W. (his ex-wife and her boyfriend); and
>
> *Three*, the defendant intended that the murder be committed as consideration for the receipt of or a promise to pay anything of pecuniary value.

(Doc. 77; Instruction Nos. 12 & 13).

### B. The Evidence[1]

Defendant argues that, he did not possess the requisite mens rea and therefore "the evidence was insufficient to convict him of murder for hire. (Doc. 95-1, at 6). The Court finds the evidence was sufficient to prove defendant possessed the necessary mens rea for a reasonable jury to find him guilty of murder for hire. The evidence showed that defendant and D.H. met and began a relationship in 1996. That same year, defendant kidnapped D.H. and hit her repeatedly, resulting in defendant's conviction for kidnapping and burglary. (Exhibit 20). Nevertheless, shortly thereafter defendant and D.H. married and eventually had two children. They later divorced. In 2011, defendant began serving a term in federal prison. Defendant blamed D.H. for his

---

[1] The trial transcript is not available, so the Court's summary of the pertinent facts is based upon the parties' statements of fact in their briefs and the Court's own recollection.

conviction. Defendant first served time at a prison in Indiana. There, defendant asked another inmate if the inmate knew someone defendant could hire to kill D.H. and the federal judge who sentenced defendant. The inmate did not assist defendant. Defendant was later transferred to a prison in Arkansas.

For several years thereafter, defendant and D.H. rarely spoke except as necessary to comply with a court's child visitation order. In late 2017 and early 2018, however, defendant and D.H. began speaking more regularly, exchanged emails, and somewhat renewed their relationship. When defendant learned that D.H. began dating other men, however, the relationship quickly soured. In February and March 2018, defendant was verbally abusive to D.H. during recorded phone calls, threatening to harm her. In recorded calls with his son, defendant expressed his intent to kill D.H. and her new boyfriend, A.W. Defendant displayed anger, jealousy, and a desire for vengeance in these recorded calls and emails.

Fellow inmate William Risinger testified that defendant asked Risinger for help in finding someone to kill D.H. Risinger claimed to know how to contact someone willing to do so, but actually contacted law enforcement officials. Agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") provided a phone number to Risinger, directing him to pass the number along to defendant. Defendant called the number, answered by an ATF agent acting in an undercover capacity and posing as a hitman. Between February and May 2018, defendant called the agent thirteen times, and also exchanged emails with the agent. Aware that the prison can monitor and does record all such communication, defendant spoke in code with the agent, referring to D.H. and her boyfriend as real estate properties and variously discussed destructing them or remodeling one and destroying the other.

The agent traveled to Olwein, Iowa, where D.H. lived, and with directions defendant provided was able to find D.H.'s residence and the restaurant where she

4

worked. In a phone call with defendant from Iowa, the agent told defendant that he was having trouble finding the other "property," referring to D.H.'s boyfriend. Defendant suggested the agent follow D.H. from her work in order to find the second property.

The agent requested defendant provide the agent with a down payment for the job. Defendant offered a collectable car, worth a few thousand dollars, to the agent. Defendant then made arrangements with a friend who was storing the car to provide it to the agent.

In April 2018, the agent traveled to Arkansas and met with defendant in prison. The meeting was audio and video recorded. It lasted approximately two hours. Defendant had never met the agent before and the meeting took place in a visiting room where others, including correctional staff, were present. Defendant spoke with the agent quietly and in code most of the time and was distrustful of the agent, suspecting him to be a law enforcement officer. Defendant discussed different options with the agent, including disfiguring or maiming D.H. instead of killing her, at one point saying he did not want to go "that far," meaning killing his ex-wife. The agent explained that he did not do that type of work, explaining that just harming people leaves witnesses, and that if defendant wanted that done defendant should hire someone else. The agent told defendant that it seemed like defendant did not know what he wanted and if defendant did not want the agent to kill the intended victims, he should just say so and the agent would leave with no hard feelings. Eventually, in response to a direct question whether defendant wanted the agent to kill D.H. and A.W., defendant nodded his head. Defendant did not want to verbalize the agreement, however, saying "why can't I shake my head and you know it's good?"

The agent ended the meeting by telling defendant he would send defendant a contract so that there would be no question as to what defendant wanted done. The agent also asked defendant if there was anything he wanted the agent to say to D.H. when the

5

agent killed D.H. Defendant asked the agent to tell D.H. that "this is the road you chose," words defendant had used during verbally abusive and threatening phone calls with D.H. The agent later sent defendant two contracts, each of which referred to D.H. and A.W. as properties one and two, respectively. One contract called for the "destruction" of both properties together at a cost of $21,000; the other contract called for the destruction of both properties, but separately, at a cost of $41,000.

Defendant received the contracts at the prison, opened in front of his counselor as legal mail. Risinger contacted the ATF and informed them that defendant intended to have another person sign the contract for him, and also intended to write a note on top of the contract so as to leave an imprint on the first page of the contract. The ATF received the contract that called for killing D.H. and A.W. together; it bore a signature in defendant's name. No other documents arrived in the envelop with the contract. At trial, another inmate defendant knew (but Risinger did not) admitted that he signed defendant's name, although he did not recall doing so. Further evidence established that both that inmate's palm print and fingerprint, and defendant's fingerprints, were on the contract. An examination of the first page of the contract corroborated Risinger's information in that it bore the imprint of writing that purported to instruct the agent not to go through with the destruction of the properties and inquiring about a refund of the down payment. The note was not in the envelope with the contract.

Defendant spoke with the agent after sending the contract to the agent. Defendant confirmed the agent got the contract. Defendant also requested that the agent record the destruction of the properties because defendant wanted it for his memories.

A short time later, agents met with defendant. In a recorded meeting, the agents first used a ruse and told defendant that his ex-wife and another unknown person were found dead and burned in a van that belonged to defendant's wife. Defendant asked about his children, but did not appear upset about his wife's death. Defendant denied

any knowledge of who would want to harm D.H. The agents then revealed that D.H. was not harmed, that they had recordings of defendant's abusive phone calls and emails with D.H., and that the person he hired to destroy properties was, in fact, an undercover ATF agent. Defendant at first denied meeting with anyone at the prison. Then defendant admitting meeting with the agent, but claimed he thought the agent was a member of the Mexican Cartel. Defendant stated he was working with the man to buy properties in Iowa with the intent to launder money through the properties. Defendant testified at trial that he became aware that the man intended to kill D.H. because the Cartel was concerned about D.H. having caused defendant's incarceration and saw her as a risk to the money laundering operation. Defendant denied asking the agent to kill D.H. or A.W.

### C. *Analysis*

There was more than sufficient evidence for a reasonable jury to conclude that defendant intended to have the agent kill D.H. and A.W. Viewed in the light most favorable to the verdict, the evidence showed defendant had a motive to kill his ex-wife and her boyfriend. Defendant was angry with D.H., felt betrayed by her relationship with A.W. Defendant was jealous and demanded that D.H. not have relationships with men because she was responsible for putting him in prison where he was deprived of being able to have relationships with women. Defendant previously talked to another inmate about wanting to hire someone to kill his ex-wife. Despite the coded language and defendant's exploration of other alternatives, such as maiming or disfiguring D.H., his statements to the agent and the act of sending the contract to the agent evinced an intent to have the agent kill D.H. and A.W. Defendant's explanation to the jury, that he believed he was working with the Cartel to buy properties in Iowa, was patently unbelievable and the jury acted well within its discretion to reject it.

Defendant also argues that the government failed to disprove that he was

7

entrapped. At trial, defendant argued to the jury that the agent doggedly persisted in plan to murder D.H. and A.W. and would not take "no" for an answer. Defendant argued that the agent tried to manipulate defendant by talking about A.W. to make defendant jealous. Defendant also argued that the agent applied pressure by talking about defendant owing the agent for his time and effort. Defendant argued that he believed the agent was a professional hitman and therefore was in fear of backing away from the arrangement because he now owed the hitman money. In his renewed motion for judgment of acquittal, defendant argues that the undercover agent "would not take 'no' for an answer" and that, although "perhaps [defendant was] [pre]disposed to hurt [his ex-wife] with his own hands, [he] was not predisposed to hire someone to kill [her]." (Doc. 95-1, at 4-5).

The Court instructed the jury that the government had the burden of proving beyond a reasonable doubt that the defendant was not entrapped by showing either:

> (1) the defendant was willing to commit the crime of murder for hire before he was approached or contacted by law enforcement agents or someone acting for the government; or
> (2) the government, or someone acting for the government, did not persuade or talk the defendant into committing the crime of murder for hire.

(Doc. 87; Instruction No. 21). "Inducement focuses on the government's actions, whereas predisposition 'focuses on whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime.'" *United States v. Myers*, 575 F.3d 801, 805 (8th Cir. 2009) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). These elements are "often closely linked," in that "the need for greater inducement may suggest that the defendant was not predisposed to commit the crime; and conversely, a ready response to minimal inducement indicates criminal predisposition." *Id*. "Entrapment is an affirmative defense generally left to the jury . . . ." *United States v. Coleman*, 284 F.3d 892, 894-

8

95 (8th Cir. 2002) (citations omitted). "Where the evidence is in conflict, [courts] leave the jury's verdict undisturbed." *Myers*, 575 F.3d at 801. Defendant argues that he was entrapped as a matter of law. (Doc. 95-1, at 4). "In order to demonstrate entrapment as a matter of law, the evidence 'must clearly have indicated that a government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent.'" *United States v. Holmes*, 13 F.3d 1217, 1220 (8th Cir. 1994) (quoting *United States v. Randolph*, 738 F.2d 244, 245 (8th Cir. 1984) (per curiam)). Inducement "consists of more than just providing an opportunity to break the law." *United States v. Clarett*, 907 F.3d 1100, 1103 (8th Cir. 2018).

The Court finds that defendant's argument is without merit and that there is no basis to disturb the jury's verdict. Here, the government presented evidence that defendant previously asked an inmate in another prison, years earlier, about hiring someone to kill his ex-wife, and also kill the sentencing judge. *See United States v. Abumayyaleh*, 530 F.3d 641, 650 (8th Cir. 2008) (prior bad acts are admissible to show predisposition when an entrapment defense is asserted). This evidence alone demonstrated predisposition. Defendant's threatening phone calls and express statements of intent to kill D.H. and her boyfriend further showed a predisposition to commit the crime. The distinction defendant makes between a predisposition to kill D.H. himself, as opposed to hire another do to it, was not supported by the evidence and was one the jury was free to reject.

The government also showed that the agent did not induce defendant to commit the crime. Defendant sought out someone to kill D.H. Defendant called the phone number of someone he understood would commit the act. Defendant spoke with the agent about destroying properties. Although defendant vacillated from time to time between whether he wanted the agent to kill D.H. and A.W., or maim or disfigure one

9

or both, or try to scare off A.W. with a threatening phone call, the jury could reasonably conclude that defendant ultimately decided on his own to have them killed. The agent repeatedly told defendant that he only kills people and defendant was free to contact someone else if defendant wanted anything else short of killing. At the prison, the agent expressly stated that if the defendant did not want the victims killed, he and defendant would part ways without any hard feelings. That the agent did not end the communication when defendant equivocated about what he wanted done did not constitute inducement.

Accordingly, the Court finds no basis to disturb the jury's verdict. Defendant's motion for judgement of acquittal is denied.

## II. MOTION FOR A NEW TRIAL

Federal Rule of Criminal Procedure 33 governs defendant's Motion for New Trial. Rule 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). A court has broad discretion in considering a motion for new trial. *See United States v. Garcia*, 569 F.3d 885, 889 (8th Cir. 2009); *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). A court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)); *see also United States v. Starr*, 533 F.3d 985, 999 (8th Cir. 2008). However, district courts "must exercise the Rule 33 authority 'sparingly and with caution.'" *Campos*, 306 F.3d at 579 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). A district court "should grant a new trial only if 'the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.'" *Peters*, 462 F.3d at 957 (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)). As the Eighth Circuit Court of Appeals has explained:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Lincoln*, 630 F.2d at 1319 (8th Cir. 1980); *see also United States v. Johnson*, 474 F.3d 1044, 1050-51 (8th Cir. 2007) (repeating applicable standard of review).

Here, the Court does not find that a miscarriage of justice may have occurred. For the reasons set forth above in relation to defendant's motion for judgment of acquittal, there was more than sufficient evidence for a jury to convict defendant and reject his entrapment defense. The Court's own weighing of the evidence leads the Court to conclude that defendant fully intended to hire someone to kill D.H. and A.W., that he is a violent and jealous man who sought to avenge the wrongs and betrayal he believed he suffered at D.H.'s hands. The Court further found that defendant himself accentuated the evidence of his intent and consciousness of guilt through his false explanation to the jury for his contact with the agent and his attempts to distance himself from the contract and fabricate a missing letter calling off the murders.

The Court also rejects defendant's entrapment defense. The Court found the evidence of defendant's prior attempt to locate someone to kill his wife and the sentencing judge as alone sufficient to establish his predisposition to hire the agent to kill D.H. and A.W. in 2018. Further, the Court found nothing in the agent's conduct to constitute improper inducement of the defendant; indeed, the agent was diligent in providing several

11

opportunities for defendant to walk away from the plan. Although the Court found that defendant presented enough evidence to warrant an entrapment instruction, the Court does not find that any entrapment occurred. This was manifestly not a case where the agent created a substantial risk that an otherwise law-abiding person would commit a criminal offense. Rather, the agent provided defendant an opportunity to break the law. After contemplating his options, defendant seized the opportunity. That is not entrapment.

Accordingly, the Court denies defendant's motion for a new trial.

### III. CONCLUSION

For the reasons stated, the Court **denies** defendant's Motion for Judgment of Acquittal and New Trial. (Doc. 95).

**IT IS SO ORDERED** this 13th day of March, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa